UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80102-CR-ROSENBERG/HOPKINS

UNITED STATES OF AMERICA

v.

MICHAEL C. BROWN,
JUSTIN R. HARRIS,
RONALD F. RYAN, Jr.,
PHILIP N. ANTICO,

        Defendants.
_____/

## GOVERNMENT'S MOTIONS IN LIMINE

The United States, by and through the undersigned attorney, hereby files its Motions in Limine, as detailed below.

## SUMMARY OF THE EVIDENCE

The Indictment charges defendants Michael C. Brown, Justin R. Harris, and Ronald F. Ryan, Jr., with aiding and abetting each other to willfully violate J.B.'s civil rights by using a dangerous weapon, and applying excessive force to J.B., causing him to suffer bodily injury, in violation of Title 18, United States Code, Sections 242 and 2. The Indictment further charges defendants Brown, Harris, and Ryan with falsifying an incident report, in violation of Title 18, United States Code, Section 1519, and defendants Harris and Philip N. Antico with aiding and abetting each other to falsify an incident report, in violation of Title 18, United States Code, Sections 1519 and 2. Finally, the Indictment charges defendant Antico with Obstruction of Justice, in violation of Title 18, United States Code, Section 1512(b)(3).

## The Excessive Force Violations

During the early morning hours of August 20, 2014, an officer from the Boynton Beach Police Department (BBPD) attempted to stop a vehicle that was driven by B.H., whose passengers were J.B. (in the front seat), and A.H. (in the back seat). The officer

1

followed the vehicle and activated his flashing overhead-lights, signaling to B.H to stop. B.H. ignored the flashing lights and continued driving at a slow to moderate rate of speed. The officer radioed the traffic infraction to other officers in the area, and continued to follow the vehicle, when he saw a bag being thrown from one of the windows. The officer announced his observation over the radio, and other officers joined in pursuit of the vehicle.

When the vehicle approached an entrance ramp to the highway, B.H. side-swiped a police officer who was on foot in the middle of the street, preparing to throw out road spikes. The lead police unit, which was following closely behind the vehicle and was unaware that an officer was standing in the street, also struck the pedestrian officer, causing severe injury, but not death. The lead police pursuit vehicle then stopped to aid the injured officer, while the other officers escalated the pursuit to a high-speed-chase of a fleeing felon.

J.B., the front seat passenger, pleaded with B.H. to stop the vehicle, who refused. As the police officers pursued the vehicle on the highway, a patrol vehicle pulled alongside the eluding vehicle and an officer pointed a Taser or handgun at the occupants of the vehicle, yelling, "Pull over! Pull over! We're going to fucking kill you!" In response, J.B. raised his hands and held them out of the vehicle to show the officers that he was unarmed.

B.H. left the highway at 6th Avenue, and then turned onto a residential street, when defendant Brown used his patrol vehicle to bump the rear of the eluding vehicle in an attempted precision immobilization technique (PIT) maneuver. BBPD does not teach or authorize its officers to use a PIT maneuver, which is an unstable use of deadly force. Defendant Brown, as the K-9 officer, was the only officer driving an S.U.V., and therefore, is clearly identifiable on a video of the incident. The forced collision disabled the eluding vehicle, and defendant Brown then pulled his patrol vehicle directly alongside the vehicle, pinning closed both the front and rear doors on the driver's side. Brown, followed by defendants Ryan, Harris, and several other BBPD officers swarmed the vehicle. J.B. kept his hands raised and remained seated in the front seat with the seatbelt fastened. The driver climbed out of the front seat and into the backseat of the car. Defendant Brown,

who was the first officer to reach the vehicle, approached with his gun aimed at the car, opened the front passenger door, kicked J.B., and then used his hand that was holding his firearm to repeatedly strike J.B. Defendants Brown and Ryan then reached into the vehicle and struck J.B., and attempted to pull him out of the vehicle. While J.B. was in the car, officers Brown and Harris deployed their respective tasers against J.B. At some point, officers realized that J.B. still had his seatbelt on, and ordered him to remove it. The seatbelt was unfastened, and defendants Brown and Ryan pulled J.B. out of the car and onto the ground, where they repeatedly struck him without making any attempt to handcuff him.

BBPD officers also forcefully removed B.H. and A.H. from the car. Officers tased both B.H. and A.H., and punched and kicked B.H. repeatedly. In addition, after B.H. was handcuffed and lying face down on the ground, defendant Brown ran up to B.H., and kicked B.H. in the face.

As a result of the assaults, all three occupants of the vehicle suffered injuries. J.B. had visible scrapes, lacerations, and bruises to his face, B.H. had severe lacerations and bruises to his head and face, and injured eyes that were swollen shut, and A.H. had dried blood around her nose from being struck. All three had skin punctures from the Taser probes.

## **The False Reports**

At the time of the assaults, a PBSO helicopter was flying overhead, providing spotlight assistance. BBPD personnel were unaware that the helicopter was also recording their actions. On the date of the incident (August 20, 2014), before learning that the incident had been video recorded, defendants Brown, Harris, and Ryan all wrote and submitted false reports, in which they omitted any mention of having hit and kicked J.B. Defendant Brown wrote that he tased the victim after the victim refused several verbal commands to exit the vehicle, but never mentioned that he punched and kicked J.B., or hit him with a firearm. Defendant Harris wrote that he attempted to electro-shock the victim for failing to exit the vehicle, but claimed that the Taser's electrical circuit did not connect. Harris failed to mention that he ever struck J.B. Defendant Ryan wrote that after Brown electro-shocked J.B. for failing to exit the vehicle, J.B. complied and was handcuffed.

3

However, Ryan failed to acknowledge that he had any physical contact with J.B.

Significantly, on August 20, 2014, the BBPD detective on duty was called to investigate B.H. as a defendant for Aggravated Battery of a Law Enforcement Officer, for the officer he struck with the car. The detective also had to file the probable cause affidavits for J.B. and A.H., since their arrests arose out of the same event. J.B. was charged with the misdemeanor offense of resisting arrest without violence. The detective read the reports of defendants Brown, Harris, and Ryan, and asked Brown and Ryan if their information was complete. Both Brown and Ryan replied that it was. As a result, the detective copied portions of text that were in the reports of both Brown and Ryan, and placed that information into his arrest affidavit of J.B., stating that J.B. "refused several loud verbal commands," so defendant Brown had to tase J.B., after which J.B. "complied and was removed from the vehicle and placed in handcuffs (spaced and double locked)." This affidavit was the basis of the misdemeanor charge against J.B.

Approximately four days after the incident, PBSO contacted BBPD Chief Jeffrey Katz, and informed him that they had video of BBPD officers that Katz should be aware of. After Chief Katz received a copy of the video, he instructed one of his Majors to collect the officers' written narratives of the incident, compare it to the video, and then make a recommendation as to how to proceed. Chief Katz's expectation was that the officers would neither view the video, nor be made aware of the existence of the video, prior to completing their incident reports.

Unbeknownst to the Chief, the video made its way to defendant Antico on August 27, 2014, approximately one week after the incident. Antico was the direct supervisor of the officers involved in the incident, and was required to write a Supervisor's Incident Report (SIR), in which he would make recommendations to his chain of command about whether the conduct of the officers was justified and appropriate.

Defendant Antico viewed the video with defendant Brown, after which Antico began to review the written incident reports that officers had already submitted as completed and ready for a sergeant's review. Of the nine officers on the scene of the arrest, two did not use force; one officer documented some force used against A.H., one officer had not

4

yet submitted his report as complete[1], and five officers, including defendants Brown, Harris, and Ryan, failed to document any strikes, punches, or kicks. Importantly, no officer initially reported striking or kicking J.B.

Over the next two days, Antico repeatedly returned completed reports that did not document strikes or kicks against J.B. or B.H. In particular, defendants Brown, Harris, and Ryan submitted reports as complete that did not indicate that any of them had struck or kicked J.B. Instead, defendant Antico returned the initial submitted reports of Harris and Ryan, which allowed them to include the previously omitted physical strikes that each used against J.B., as well as offer false justifications for their use of force. Defendant Ryan also fabricated increased resistant and threatening behavior by J.B. after Antico returned his report, which Ryan had never claimed before. In his initial report, Brown also failed to include any mention of his use of the PIT maneuver, which is a violation of BBPD policy. Brown made multiple changes to his report, including after his report was returned by a different sergeant. Brown submitted a final report after having viewed the video, in which he detailed his use of the PIT maneuver, his justifications for using such a maneuver, and that he stuck J.B. several times with a closed fist. Brown did not mention that he struck J.B. with a firearm, or that he kicked B.H. After Brown, Harris, and Ryan made these material changes to their reports, defendant Antico approved and transmitted them into the BBPD's final felony packet that was delivered to the State Attorney's Office.

Defendants Brown, Harris, and Ryan were not the only officers who omitted their use of force in their initial reports. Two other BBPD officers who arrested B.H. initially left out any strikes, punches, or kicks of B.H., even though several officers are clearly visible assaulting B.H. on the video. After defendant Antico viewed the video, he returned the reports of those additional officers as well, allowing them to modify their reports to add strikes and to falsify justifications for the force they used. After officers made these material revisions to the incident reports, Antico approved them and also transmitted them into the BBPD's final felony packet. He then completed his SIR, which was essentially a compilation of the revised incident reports. The SIR did not notate or otherwise indicate

---

1  This officer did not submit his report as completed until after Antico viewed the helicopter video on August 27, 2014.

5

that the officers' incident reports had been materially altered. Defendant Antico wrote in his SIR that "the amount of force officers employed in the execution of their duties was necessary to take all three suspects into custody," and that he determined that "no further action should be taken."

Importantly, the BBPD report writing system automatically prints the final version of the report only, which is dated with the date of *the incident*. Therefore, all of the final, revised incident reports were date stamped August 20, 2014, despite having been written more than one week later. Also importantly, the defendants were unaware that the report writing system retained a digital audit trail of the material changes they made to their reports.

After receiving the officers' (final) incident reports and the SIR, Chief Katz referred the matter to the State Attorney's Office and the Federal Bureau of Investigation to determine whether the officers violated state and/or federal laws.

### Antico's Obstruction of Justice

During the investigation, the FBI questioned defendant Antico on February 19, 2015, as the supervisor of the officers involved in the August 20, 2014 incident. At that time, both the FBI and Antico were unaware that the BBPD report writing system retained a digital audit trail of draft reports. Rather, the FBI had the reports that were submitted to the State Attorney's Office for the prosecution of B.H., who had been charged with Aggravated Assault of a Law Enforcement Officer and related charges. As a result, the FBI only had the final versions the officers had submitted more than one week after the incident, which, as explained above, were stamped with the date of the incident – August 20, 2014.

Defendant Antico voluntarily spoke to the FBI for approximately 4 hours. He was accompanied by an attorney appointed for him by the Patrolmen's Benevolent Association. The FBI allowed him to take breaks, and to have private consultations with his attorney if requested. The tone of the interview was friendly and non-confrontational. Because the FBI had the helicopter video and what they thought were the only versions of the offense reports, which documented some force used, the investigators thought of

6

Antico purely as a witness. Their goal was to find out how Antico obtained the reports, and whether the reports were trustworthy.

During this interview, Antico lied to investigators when he stated that all of the officers' reports were written on August 20, 2014, and did not mention that they had been altered. Antico further lied when he told the FBI that he never had to correct the officers, stating that he "never had an issue with these guys not being accurate in their report writing, which would …paint a picture of what happened." Antico also falsely told FBI agents that Brown put the PIT maneuver ("the policy violation") in his first written submission. Antico never mentioned that a number of the officers had submitted initial reports that failed to mention any punches, kicks, or strikes.

The FBI only discovered the digital audit trail of the reports after the February 19, 2015 interview with Antico. The FBI asked Antico to return on April 2, 2015, and confronted him with the digital audit trail. During this second interview, Antico offered a confusing litany of excuses, which will be discussed in further detail below.

## MOTIONS IN LIMINE

The government now submits the following motions in limine:
1) to exclude defendant Antico's April 2, 2015 statement, except for one admission;
2) to exclude a witness officer's Internal Affairs file;
3) to exclude evidence of the victim's prior criminal record; and
4) to exclude defendants' prior instances of good conduct.

### Motion to exclude defendant Antico's April 2, 2015 statement, except for one admission

As previously stated, the basis for defendant Antico's obstruction of justice count in the Indictment is his statement to the FBI on February 19, 2015 (the February Statement). In the February Statement, Antico lied to the FBI when he stated that he had no reason to doubt his officers, because they documented that they used force in their initial reports. However, Antico failed to mention that the first completed reports did not list force, which he rejected.

Following the February Statement, the FBI obtained the digital audit trail, which

captured the multiple changes the officers had written. After analyzing the audit trail, the FBI asked Antico to come back on April 2, 2015 (the April Statement), and confronted him with the trail of changed reports. In the April Interview, which was 3 hours long and recorded, Antico attempted to offer fabricated explanations for his role in the creation of the reports. The FBI ended the interview after realizing that Antico was being untruthful, in part because he contradicted his previous statements in the February statement. The government has decided not to introduce the April Statement in its case in chief, and moves to preclude it as self-serving hearsay, with the exception of one discrete admission from Antico: that he watched the PBSO helicopter video with Mike Brown on August 27, 2014, after Antico returned to work from vacation, and before Antico started reviewing reports.

With the exception of the admission identified above, the April Statement consists largely of Antico's attempts to justify his criminal behavior. When offered by the defense, a defendant's own out-of-court statements – like any other out-of-court statements – are hearsay, which is forbidden by Fed. R. Evid. 802. A defendant may not introduce his statements under Fed. R. Evid. 801(d)(2), which permits the introduction of out-of-court statements of a party-opponent, because he is not a party-opponent *to himself*. *See* Wright & Miller, *Federal Practice and Procedure* § 6715 ("Relevant admissions of a party, whether consisting of oral or written assertions or nonverbal conduct, are admissible when offered by an opponent."); *United States v. Bond*, 87 F.3d 695, 699-700 (5th Cir. 1996); *see also United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) (holding evidence inadmissible under Rule 801(d)(2) "because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants"). Similarly, because the government will not ask its witnesses about the bulk of the April Statement, Antico cannot raise the content of the rest of the statement on cross-examination. *See United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985) (affirming district court's refusal to permit defendant to cross-examine government witnesses about his post-arrest statement); *see also United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) (affirming order refusing to permit defendant to cross-examine officer concerning defendant's post-arrest statement).

Nor can Antico attempt to introduce the bulk of his April Statement under the Rule of Completeness. Rule 106 states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part–or any other writing or recorded statement–that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The rule "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Simms,* 385 F.3d 1347, 1359 (11th Cir. 2004) (*quoting United States v. Pendas-Martinez,* 845 F.2d 938, 944 (11th Cir. 1988)). In this circuit, exculpatory statements made by a defendant may be admitted pursuant to Rule 106 if "relevant to an issue in the case and necessary to clarify or explain the portion received." *United States v. Pacquette*, 557 Fed.Appx. 933, 937 (11th Cir. 2014) (*citing United States v. Range*, 94 F.3d 614, 621 (11th Cir. 1996)).

Here, the February Statement was a completed interview, which stands alone. Antico is a law enforcement Sergeant who has experience conducting interviews of suspects. He discussed his involvement in the report writing process during the four hour interview, and was given ample opportunity to qualify or clarify his statements. At the close of the interview, the FBI investigators asked Antico if there was any other relevant information he needed to add, to which Antico replied, "You guys covered everything." Importantly, Antico did not ask to return to clarify his statements; rather, the FBI called him back to confront him roughly two months after the February Statement. Thus, there is no danger that the jury will be misled as to the context of the February Statement, because the jury will be able to hear it in its entirety (absent redactions for hearsay or *Bruton* issues). Accordingly, there is no need for introduction of the April Statement to clarify the February Statement under the Rule of Completeness.

Nor can Antico argue that because the government seeks to introduce one discrete admission from the April Statement, he should be permitted to introduce the rest of the April Statement under the Rule of Completeness. Rule 106 does not automatically make an entire statement admissible if only a portion is presented to the jury. *Simms*, 385 F.3d 1359. Rather, introduction of the additional material must be necessary to qualify, explain, or place into context the portion already introduced. *Id.* Antico's fabricated explanations

9

for his role in the creation of the reports will not qualify or place into context the one discrete admission from the April Statement that the government seeks to introduce: simply, when Antico viewed the PBSO helicopter video. Further, as discussed above, Antico's false exculpatory statements are hearsay, and the Rule of Completeness does not render them admissible. Rule 106 does not "require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *United States v. Hassan*, 742 F.3d 104, 134 (4th Cir. 2014) (*quoting United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008)).

Of course, Antico can tell the jury his version of the events - by testifying at trial, subject to cross-examination. But even if he chooses to testify, Antico cannot introduce the April Statement, as it remains hearsay. Antico may offer relevant testimony about what occurred, but he cannot also put a totally self-serving prior consistent oral account of his story before the jury.

Introduction by the defense of Antico's April Statement would also violate Rule 403. If Antico does not testify, admitting the statements would plainly confuse and mislead the jury and unfairly prejudice the United States because the government cannot cross examine prior, unsworn, out-of-court statements. If Antico does testify, jurors will have ample opportunity to assess the credibility of his story. In addition, it is well-settled that "a witness cannot be corroborated on direct or redirect examination or rebuttal by proof of prior statements consistent with his in court testimony. Whatever inherent probative value such consistent statements may have is felt to be insufficient when viewed in light of trial concerns." Wright & Miller § 703 (citing Rule 403); *see also United States v. McCulley*, 178 F.3d 872, 876 (7th Cir. 1999) (no error in refusing to admit testifying defendant's own prior statement and observing that "[i]t is, of course, improper to admit a previous statement for the mere purpose of bolstering a statement made at trial"); *United States v. Acker*, 52 F.3d 509, 517 (4th Cir. 1995) ("The testimony as to Holly's out-of-court statement to Rozzi was admitted solely to corroborate what Holly testified to 'in the courtroom today.' A prior consistent out-of-court statement of a witness is not admissible for this purpose").

Accordingly, the government moves to exclude Antico's April Statement, except

10

for the discrete admission identified above. Defendants Antico, Brown, and Ryan oppose this motion. Defendant Harris takes no position.

### Motion to exclude a witness officer's Internal Affairs file

One police officer who will testify at trial is a senior officer, with over 15 years on the job at BBPD. The government has examined the witness's Internal Affairs (IA) file, and found that BBPD has disciplined him approximately 14 times, for offenses that have no bearing on his credibility. The government now moves to preclude reference to this officer's IA file.

Specifically, in 2002, BBPD disciplined the officer for neglect of duty, and gave him a verbal reprimand. In 2003, BBPD gave the officer written reprimands for integrity of the reporting system (for failure to timely file a report), neglect of duty, conformance to law, performance, and punctuality. The officer also had to forfeit two hours of pay for his last offense in 2003. In 2004, BBPD disciplined the officer for abuse of authority (for improperly towing a vehicle), and suspended him for 11.5 hours. Also in 2004, BBPD gave the officer written reprimands for "audio/visual" (failure to record a traffic stop), and neglect of duty. In 2005, BBPD gave the officer a verbal reprimand for performance, a written reprimand for a first chargeable crash, and suspended the officer for 11.5 hours for a second chargeable crash. BBPD did not discipline the officer again until 2010, when he was given a verbal reprimand for "prisoner holding facility procedures" (for failure to remove the drawstrings from a prisoner's clothing). Finally, in 2015, BBPD suspended the officer for one day for a courtesy violation. Additionally, from November 20, 2013 to March 14, 2016, the officer received 8 citizen complaints for discourteous conduct, none of which were sustained. These unfounded complaints, combined with the single sustained 2015 courtesy violation, caused the BBPD to place the officer on a Performance Improvement Plan (PIP), based on a pattern of behavior. The officer then successfully completed the PIP.

The government moves to exclude any reference during cross-examination or comment by any defense counsel in the presence of the jury regarding these disciplinary actions, as they are not grounds for impeachment. The sustained incidents do not involve dishonesty, lying, or any other form of willful misrepresentation. As such, they are not

11

specific instances of misconduct that are probative of untruthfulness, as contemplated by Fed. R. Evid. 608(b). The sustained incidents do not involve a conviction of a crime within the meaning of Fed. R. Evid. 609. Finally, given that the incidents are resolved, bias, interest, or motive are not valid bases for impeachment here. Thus, per Fed. R. Evid. 402, the incidents are not relevant. *See, e.g., United States v. Novaton*, 271 F.3d 968, 1005-07 (11th Cir. 2001) (affirming district court's decision that prior sanction of testifying detective that was unrelated to truthfulness was properly excluded as irrelevant).

Even if this Court were to find the sustained incidents relevant, the government submits that they should be excluded under Fed. R. Evid. 403, as their probative value is substantially outweighed by the danger of unfair prejudice to the government. Fed. R. Evid. 609 contemplates using *convictions* with impeachment value that occurred within the past 10 years. The Eleventh Circuit has held that a presumption exists against the use of prior crime impeachment evidence over ten years old. *United States v. Tisdale*, 817 F.2d. 1552. 1556 (11th Cir. 1987). Here, the bulk of the officer's sustained complaints - which are not criminal convictions, and have no bearing on his credibility - are from 2002-2005, or, well over 10 years ago. The age of the sustained complaints adds to their probative value being outweighed by their prejudice.

Nor is the PIP relevant to the officer's integrity, as it is based on unfounded complaints. Introduction of such evidence is not probative of untruthfulness, and would only serve to confuse the jury. *See United States v. Taylor*, 417 F.3d 1176, 1178-1180 (11th Cir. 2005) (affirming refusal to allow defendant to cross-examine officer regarding 13 unfounded internal affairs complaints); *Novaton*, 271 F.3d at 1006-07 (unproven allegations that detective had stolen cocaine was properly excluded as overly prejudicial).

The government had previously provided the defense with summaries of the officer's IA findings and PIP. The government has since provided the underlying documents from the IA file. Defendants Brown, Harris, and Ryan object to the government's motion to preclude reference to the officer's IA file; defendant Antico takes no position.

### **Motion to exclude evidence of the victim's prior criminal record**

The victim in this case, J.B., was a passenger in a vehicle that eluded police

12

officers after a traffic incident that caused officers to believe that the driver had struck and fatally injured another police officer. The government may choose to present testimony from the victim, J.B., in its case in chief. If the victim does not testify, the government moves to exclude any reference to or elicitation of any evidence establishing the victim's prior criminal record.

If the victim testifies at trial, the government moves this Court to preclude reference to or introduction of any evidence of the victim's juvenile adjudications, the victim's prior arrests, and any conviction or release from confinement for a conviction for which more than ten years have elapsed. The government acknowledges that the Eleventh Circuit has ruled that "Rule 609 requires that evidence of prior convictions of a non-defendant witness be admitted if (1) the convictions are for crimes punishable by death or imprisonment in excess of one year, (2) the convictions are less than ten years old, and (3) the evidence is being used to attack the witness' credibility." *United States v. Burston*, 159 F.3d 1328, 1335 (11th Cir. 1998). This rule is not absolute, however, and the Eleventh Circuit has noted "that the probative value of the evidence not be substantially outweighed by the prejudice, confusion, or delay created by admission of the evidence." *United States v. Burston*, 159 F.3d 1328, 1335 (11th Cir. 1998).

In the present case, the prospective victim-witness, J.B., has the following felony convictions:  (1) aggravated assault with a weapon and possession of a weapon, from October 3, 2011; (2) eluding arrest in a vehicle, from May 13, 2009; (3) eluding arrest in a vehicle, from September 12, 2008; (4) failure to appear, from on or about December 17, 2007; and (5) possession of cocaine, from December 17, 2007. The entire event and all of the alleged conduct that precipitated the apprehension in this case (*i.e.*, failure to stop at stop, aggravates assault on law enforcement officer, felony eluding) were all caused by conduct of the driver of the vehicle. In stark contrast, the only crime charged against J.B. at the conclusion of the violent apprehension was one misdemeanor count of resisting arrest without violence. Accordingly, the prejudicial impact of introducing J.B.'s felony convictions for offenses like drug possession, etc. is substantially outweighed by any probative value of such evidence, and it should be excluded. *See Burston*, 159 F.3d at 1335.   *See also Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 816 (11th Cir.

2017) (observing that, "[e]vidence that is otherwise admissible under Rule 609(a)(1) is to be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

Finally, if the government chooses to present the testimony of victim-witness J.B. and if this Court rules that evidence of JB's prior convictions is admissible for impeachment purposes, the government requests that any cross-examination of the victim regarding his prior convictions be limited to "the nature and the number of [the victim witness's] prior felony convictions." *See Burston*, 159 F.3d at 1336. *See also United States v. Bray*, 445 F.2d 178, 182 (5th Cir. 1971) (the cross-examiner should limit his questions concerning prior crimes to the number of prior convictions, the nature of each of the crimes charged, and the date and time of each conviction).

Defendants Brown, Harris, and Ryan object to this motion; defendant Antico takes no position.

### Motion to exclude defendants' prior instances of good conduct

During the trial, one or more of the defendants may seek to cross-examine government witnesses or to introduce extrinsic evidence of specific instances when he did not commit a crime or bad act, or evidence of a good act. An example would be commendations or awards a defendant received as an officer. Another example would be that the defendant has an impressive military career. Another example may be evidence that the defendant has never had a use of force complaint sustained against him. This type of character evidence is inadmissible under Fed. R. Evid. 404 and 405.

It is well settled that a defendant may not seek to establish innocence through proof of the absence of criminal acts on specific occasions, and that evidence of good conduct is not admissible to negate criminal intent. *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (defendant who sold tickets to Christmas show which never took place was properly precluded from offering evidence of other non-fraudulent shows); *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (in trial of defendant charged with drug distribution and importation, court properly excluded evidence that he declined an invitation to join another trafficker's narcotics business under Fed. R. Evid. 405(b) and

14

404(b)); *United States v. Marrero*, 904 F.2d 251, 259-60 (5th Cir. 1990) (fact that defendant did not overcharge for psychotherapy services in every instance where opportunity presented itself was not relevant to whether defendant overcharged as alleged in the indictment); *United States v. Williams*, 205 F.2d 23, 34 (2d Cir. 2000) (excluding evidence of defendant's innocent trips to Jamaica to rebut charges of importing cocaine from Jamaica); *United States v. Neighbors*, 23 F.3d 306, 310 (10th Cir. 1994) (affirming trial court's decision to exclude evidence in drug case of defendant's advocacy against substance abuse and membership on the board of a substance abuse center); *United States v. Heidecke*, 900 F. 1155, 1162 (7th Cir. 1990) (failure to find evidence of misconduct in public official's file other than the charged misconduct was not admissible).

Nor can a defendant offer such evidence of specific instances of lawful conduct that are unrelated and irrelevant to the charged conduct as proof of character. When seeking to introduce character evidence, a defendant is limited to character traits which are "pertinent." Fed. R. Evid. 404(a)(1); *United States v. Hewitt*, 634 F.2d 277, 279-80 (5th Cir. 1981)(Unit A). What is "pertinent" will essentially be the same as what is relevant. *Id*. The rules of evidence concerning character are designed to ensure that a fact-finder reaches a decision based upon the merits of a case, and not the personalities of those involved. *United States v. Reed*, 700 F.2d 638, 645 (11th Cir. 1983). Character evidence cannot be proven through specific instances of conduct, but must be in the form of opinion or reputation. Fed. R. Evid. 405(a). Character may be proven through specific instances of conduct only on cross examination or where the "character or a trait of character is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(a),(b). Otherwise, proof of good character must be by reputation or opinion. *Id.*

For example, introduction of a defendant's military history is merely an attempt to show evidence of the defendant's good character. The Eleventh Circuit has specifically held that evidence of a defendant's military history is inadmissible to prove a defendant's good character, as character evidence must be in the form of opinion of reputation testimony, as required by the Federal Rules of Evidence. *United States v. Solomon*, 686 F.2d 863, 874 (11th Cir. 1982); *accord United States v. Rios*, 180 F.3d 262 (5th Cir. 1999) (per curiam).

15

Accordingly, the government moves to preclude the defense from presenting evidence at trial, or mentioning in openings or closing statements, specific instances of prior good acts by the defendants. The United States also respectfully requests that the Court inquire as to whether any defendant intends to introduce good character evidence other than opinion or reputation.

Defendants Brown, Harris, and Ryan object to this motion; defendant Antico takes no position.

## CONCLUSION

The government respectfully requests that this Court grant its motions 1) to exclude defendant Antico's April 2, 2015 statement, except for one admission; 2) to exclude reference to a witness officer's Internal Affairs file; 3) to exclude evidence of J.B.'s criminal history; and 4) to exclude defendants' prior instances of good conduct. The United States also respectfully requests that the Court inquire as to whether any defendant intends to introduce good character evidence other than opinion or reputation.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:   s/Susan Osborne
SUSAN OSBORNE
Court Identification No. A5500797
Assistant United States Attorney
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I caused a true and correct copy of the foregoing to be filed using CM/ECF on September 5, 2017.

                                              s/Susan Osborne
                                              Assistant United States Attorney